1  **MICHAEL N. FEUER**, City Attorney (SBN 111529x)
2  **KATHLEEN A. KENEALY**, Chief Deputy City Attorney (SBN 212289)
   **SCOTT MARCUS**, Senior Assistant City Attorney (SBN 184980)
3  **CORY M. BRENTE**, Senior Assistant City Attorney (SBN 115453)
   **TY A. FORD**, Deputy City Attorney (SBN 218365)
4  200 North Main Street, 6th Floor, City Hall East
   Los Angeles, CA 90012
5  Phone No.: (213) 978-7047
   Fax No.:    (213) 978-8785
6  Email: ty.ford@lacity.org

7  *Attorneys for Defendants* **CITY OF LOS ANGELES and LOS ANGELES POLICE**
8  **DEPARTMENT**

9                    **UNITED STATES DISTRICT COURT**
10                   **CENTRAL DISTRICT OF CALIFORNIA**
11

12  HASMIK JASMINE CHINARYAN,            **CASE NO.  2:19-cv-9302 MCS (Ex)**
    Individually and as Guardian ad Litem   [Assigned to Hon. Mark C. Scarsi, USDC-1st Cthse.,
13  for NEC, a Minor, and MARIANA        Ctrm. 7C; Magistrate Eick, Roybal-Cthse, Ctrm. 750]
    MANUYAN,
14                                        **DEFENDANTS' MEMORANDUM OF**
              Plaintiffs,                 **CONTENTIONS OF LAW AND FACT**
15
    vs.                                   **[L.R. 16-4]**
16
    CITY OF LOS ANGELES, LOS
17  ANGLES POLICE DEPARTMENT,
    CHIEF OF POLICE MICHEL
18  MOORE, SERGEANT FRED CUETO,          **FINAL PRE-TRIAL CONFERENCE**
    OFFICERS ROMERO GONZALEZ,            DATE:    August 9, 2021
19  MARIO MENSES, JEFF RODD,             CTRM:    7C
    RODRIGO SORIA, AIRAM POTTER,         TIME:    2:00 p.m.
20  DANIEL MARTINEZ, DANIEL
    GAYTON, EDUARDO PICHE,               **TRIAL**
21  BRITTANY OKE, and DOES 8-10,         DATE:    August 24, 2021
                                         CRTM:    7C
22            Defendants.                TIME:    8:30 a.m.

23

24  **TO THE ABOVE-ENTITLED COURT AND TO ALL PLAINTIFFS AND TO**
25  **THEIR ATTORNEYS OF RECORD HEREIN:**
26
27  ///
28  ///

                                1

Pursuant to U.S.D.C. Local Rules 16-4 and 16-4.1, Defendants **CITY OF LOS ANGELES and LOS ANGELES POLICE DEPARTMENT** ("Defendants") hereby submit the following Memorandum of Contentions of Fact and Law.

Dated:  July 19, 2021                    Respectfully submitted,

**MICHAEL N. FEUER**, City Attorney
**KATHLEEN A. KENEALY**, Chief Deputy City Atty.
**SCOTT MARCUS**, Senior Assistant City Attorney
**CORY M. BRENTE**, Senior Assistant City Attorney

By:   / s / Ty A. Ford
     **TY A. FORD**, Deputy City Attorney
*Attorneys for Defendants*
**CITY OF LOS ANGELES and LOS ANGELES POLICE DEPARTMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

**MEMORANDUM OF POINTS AND AUTHORITIES** .......................... 1

**I.    CLAIMS AND DEFENSES** ................................................. 1

    **A.    Plaintiffs' Claims** ................................................. 1

    **B.    Elements For Each Claim** .................................... 1

    **C.    Defendants' Evidence In Opposition
        To Each Claim** ..................................................... 2

    **D.    Defendants' Counterclaims And
        Affirmative Defenses Applicable To Claim 2** ........................ 9

    **E.    Elements To Affirmative Defenses** ...................... 9

    **F.    Defendants' Evidence In Support Of Each
        Affirmative Defense** ............................................ 9

    **G.    Evidentiary Issues** ............................................. 10

    **H.    Issues Of Law** .................................................... 10

        **1.    Defendants Did Not Violate Plaintiffs'
            Fourth Amendment Rights Via A
            Municipal "Policy, Practice Or Custom."** ................. 10

        **2.    Plaintiffs Must Prove That An Individual
            Employee Of Defendants Violated Their
            Constitutional Rights Before They Can
            Prevail On Their *Monell* Claim** ................................. 10

            **a.    Legal Standards Governing
                Municipal Liability Claims** ............................... 11

            **b.    "Policy, Custom, Or Practice."** ........................ 13

            **c.    Causation** ..................................................... 15

# TABLE OF CONTENTS

## (Continued)

**Page(s)**

d.     *Fairley v. Luman* And *Wroth v. City Of Rohnert Park* And The Question Left For The Jury .............................. 15

e.     Additional Jury Instructions Should Be Given Regarding The Underlying Constitutional Violation By A Non-Defendant Individual Employee ........................................... 19

I.     Bifurcation Of Issues ............................................ 20

J.     Jury Trial ............................................................. 21

K.     Attorneys' Fees ..................................................... 21

L.     Abandonment Of Issues ...................................... 21

M.     Witness List ......................................................... 21

N.     Exhibit List .......................................................... 21

II.    CONCLUSION ............................................................. 22

1

## **<u>TABLE OF AUTHORITIES</u>**

2

3
**Page(s)**

4
**Cases**

5
*Bull v. City & County of San Francisco*,

6
    595 F.3d 964 (9th Cir. 2010) .................................................................13

7
*Daniels v. Williams*,

8
    474 U.S. 327 (1986)............................................................................10

9
*Fairley v. Luman*,

10
    281 F.3d 913 (9th Cir. 2002) ................................................ 15, 18, 19

11
*Gravelet-Blondin v. Shelton*,

    728 F.3d 1086 .................................................................................15

12

13
*Long v. County of Los Angeles*,

    442 F.3d 1178 (9th Cir. 2006) ......................................................11, 12

14

15
*Los Angeles Police Protective League v. Gates*,

    907 F.2d 879 (9th Cir. 1990) ...........................................................12

16

17
*Lucas v. City of Visalia*,

    2013 U.S. Dist. Lexis 65855 (E.D. Cal. May 8, 2013)........................ 11, 12, 13, 15

18
*Lytle v. Carl*,

19
    382 F.3d 978 (9th Cir. 2004) ...........................................................12

20
*McDade v. West*,

21
    223 F.3d 1135 (9th Cir. 2000) .........................................................12

22
*Monell v. Department of Soc. Servs.*,

    436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) ................................ *passim*

23

24
*Orellana v. Cnty. of Los Angeles*,

    2013 U.S. Dist. Lexis 198186 (C.D. Cal. Apr. 29, 2013 .......................................13

25

26
*Quintanilla v. City of Downey*,

    84 F.3d 353 (9th Cir. 1996) ............................................................18

27
*Thompson v. Los Angeles*,

28
    885 F.2d 1439 (9th Cir. 1989) ......................................................12, 13

*Trevino v. Gates,*
   99 F.3d 911 (9th Cir. 1996) ........................................................ 12, 13, 15

*Ulrich v. City & County of San Francisco,*
   308 F.3d 968 (9th Cir. 2002) .......................................................11, 12

*Wroth v. City of Rohnert Park,*
   2019 U.S. Dist. LEXIS 229936 ............................................... 15, 16, 18

**Statutes**

42 U.S.C. § 1983 ............................................................................ *passim*

42 U.S.C. § 1988 ...................................................................................21

Bane Act .................................................................................................1

**Other Authorities**

F.R.C.P. 32(4)(a) ..................................................................................10

F.R.C.P. 49 ...........................................................................................16

Rule 16 ...........................................................................................14, 15

U.S. Const. Amend. IV ................................................................. *passim*

United States Constitution ................................................................2, 19

### MEMORANDUM OF POINTS AND AUTHORITIES

**I.   CLAIMS AND DEFENSES.**

    **A.   Plaintiffs' Claims.**

Based on the operative Complaint (the First Amended Complaint, or "FAC") and the Court's prior orders regarding Plaintiffs' and Defendants' cross-Motions for Summary Judgment/Adjudication (Docket #77), Defendants believe only certain portions of one claim remains to be tried:  Plaintiffs' Claim Second Claim for deprivation of civil rights pursuant to 42 U.S.C. § 1983 (Entity Liability), a.k.a., *Monell* liability.  In the Court's previous rulings, the Court granted qualified immunity as to all individual defendants (Plaintiffs' First cause of action pursuant to Section 1983) and as to the state law Bane Act claim (Plaintiffs' Third cause of action).  *See* Docket #77.  The Court granted Plaintiffs' Motion for Summary Judgment, in part, finding "that Defendants City of Los Angeles and LAPD Policy was the moving force behind the incident," but declined to make a finding that "whether there was probable cause to arrest Plaintiffs."  *Id*.  Thus, it appears that the only claim to be tried is whether or not there was an underlying constitutional violation pursuant to Section 1983, having already found that, if the jury finds that such a violation did indeed occur, the LAPD policy was the moving force behind such a theoretical constitutional violation.

    **B.   Elements For Each Claim.**

*Claim 2:*  42 U.S.C. § 1983 claim under the 4th Amendments for "Entity Liability" (*Monell*) regarding Plaintiffs Chinaryan, NEC, and Manukyan based on custom and practice (against Defendants City and LAPD).

*Custom And Practice Theory:*

    1.   The City of Los Angeles and Los Angeles Police Department's employee(s) [Names of individual(s)] acted under color of state law;

    2.   The acts of the City of Los Angeles and Los Angeles Police Department's employee(s) [Names of individual(s)] deprived Plaintiffs of their

particular rights under the United States Constitution;

       3.     The City of Los Angeles and Los Angeles Police Department's employee(s) [Names of individual(s)] acted pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendant City of Los Angeles and Los Angeles Police Department; and

       4.     The defendant City of Los Angeles and Los Angeles Police Department's official policy or widespread or longstanding practice or custom caused the deprivation of the Plaintiffs' rights by [Names of individual(s)]; that is, the City of Los Angeles and Los Angeles Police Department's official policy or widespread or longstanding practice or custom is so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury.] *[\* It appears this element has been resolved by the Court's partial granting of the Plaintiffs' MSJ]*.

*See* Ninth Circuit Manual of Model Jury Instructions 9.5 (2017).

### C.    **Defendants' Evidence In Opposition To Each Claim.**

***Claim 2:***  42 U.S.C. § 1983 claim under the 4th Amendments for "Entity Liability" (*Monell*) regarding Plaintiffs Chinaryan, NEC, and Manukyan based on custom and practice (against Defendants City and LAPD).

On June 14, 2019, ST Limo Company reported to the Foothill Division of the Los Angeles Police Department (LAPD) that one of its vehicles, a 2015 black Chevrolet Suburban, bearing the license plate number 80913PI had been stolen from the area near the intersection of Tinker and Summitrose in the Tujunga area of Los Angeles.

On the evening of June 16, 2019, LAPD Sergeant Fred Cueto ("Cueto"), Officers Mario Meneses ("Meneses") and Officer Ramiro Gonzalez ("Gonzalez") became aware that a "LoJack hit" for the stolen Suburban had been detected by an LAPD airship (police helicopter) near the intersection of Penrose/Tuxford and Glenoaks. Officers Meneses and Gonzalez attempted to locate the vehicle associated

with the "LoJack hit" but were unable to locate the stolen Suburban on June 16, 2019.

On the evening of June 17, 2019, the following officers were on full-uniformed patrol in LAPD's Foothill Division, driving a marked black-and-white police vehicles:  Sgt. Fred Cueto (driving alone); Officers Ramiro Gonzalez and Mario Meneses (partners in the same vehicle); Officers Brittany Primo and Eduardo Piche (partners in the same vehicle), and Officers Daniel Gayton and Zachary Neighbors, as well as two sets of senior officers paired with their respective trainee officers – Officers Airam Potter and Daniel Martinez (in the same vehicle), and Officers Jeff Rood and Rodrigo Soria (in the same vehicle).

At approximately, 7:57 PM, Sgt. Cueto was on patrol by himself in a marked police vehicle when he observed a black Chevrolet Suburban in the vicinity of Tuxford and Glenoaks driving northbound.  Sgt. Cueto recognized this vehicle as possibly the stolen Suburban and contacted LAPD dispatch to verbally query the license plate.

Sgt. Cueto reported to LAPD dispatch that the Suburban he saw bore the license plate 09344S2.  The dispatcher checked this plate number and informed Sgt. Cueto that that plate was registered to a Dodge Ram pickup truck.

Based on the information received from dispatch regarding the license plate, Sgt. Cueto believed that this black Suburban may be the stolen vehicle because, based on his training and experience, it appeared to be "cold plated."  Sgt. Cueto (as well as Officers Meneses and Gonzalez) believed that when a license plate does not match the vehicle it is attached to, it is likely either a stolen vehicle or a vehicle which is being used in the commission of a dangerous crime.

"Cold plating" is a term which refers to a criminal technique employed by vehicle thieves where the license plate of a vehicle that has been stolen is switched with the license plate of another vehicle to avoid detection by law enforcement.

///

3

1    Based on his over 21 years of training and experience (at the time of the

2    incident), Sgt. Cueto believed that stolen vehicles are often linked with armed or

3    dangerous individuals, and that when the driver of a stolen vehicle is stopped by

4    police, there is often substantial risk of significant injury to the officers and/or the

5    public.

6    Other experienced officers agree that persons driving stolen vehicles are often

7    associated with violent crimes, and may be armed.  When officers do not know

8    whether the occupants of a potentially stolen vehicle are armed, they have to rely on

9    their training and experience to guide them.  Police officers' training and experience

10   informs them that occupants of stolen vehicles are often involved in more serious

11   crimes, and may be armed, and the purpose of a "high-risk" stop is to control the

12   situation and prevent it from becoming violent.

13   Sgt. Cueto believed that the black Suburban was the same vehicle the airship

14   unit searched for the day prior and believed that there was reasonable suspicion and

15   probable cause that the vehicle he saw was stolen.

16   Sgt. Cueto used his police radio to broadcast to all nearby units in the vicinity

17   that "two additional units for a possible cold-plated vehicle, a black Chevrolet

18   Suburban" were requested to back him up, and his intention was that his subordinate

19   officers would follow the Suburban and eventually stop it.  Twenty seconds after his

20   first request, Sgt. Cueto repeated his request and also asked for an airship (police

21   helicopter), which indicated, per LAPD policy requirements, his intention to follow

22   LAPD policy for a "high-risk" stop.

23   In addition to having a cold-plated vehicle, some of the officers who heard Sgt.

24   Cueto's request for back-up also knew that a similar vehicle had been stolen two

25   nights prior, and they were in the same area in which a Lo-Jack hit for the stolen

26   SUV had been detected the night before.

27   The other officers who heard Sgt. Cueto's radio broadcast for additional units

28   and an airship – including Officers Meneses and Gonzalez – interpreted that request

4

1  as an intention by Sgt. Cueto to conduct a "high-risk" stop of the Suburban.

2        Based on the totality of the circumstances – including the very recent report of

3  a 2015 black Suburban from ST Limo – Sgt. Cueto used his discretion and decided

4  that the most appropriate method of stopping the Chevrolet Suburban with Dodge

5  Ram plates was to proceed with a "high-risk" stop (rather than an "investigatory

6  stop" or a "traffic enforcement stop") which, in accordance with LAPD and POST

7  training and procedure, involves the "proning-out" (instructions to lie down on the

8  ventral or front side of the body) on the ground of the driver (to create a position of

9  disadvantage) and the passengers, if necessary, based on the totality of the

10  circumstances.  A "high-risk stop" is sometimes also referred to as a "felony stop."

11  "POST" refers to the Peace Officers' Standards and Training manual, which is a set

12  of guidelines for all law enforcement officers in the state of California.

13        Officers Meneses and Gonzales responded to Sgt. Cueto's radio commands by

14  making a U-turn and following the Suburban.  Officer Meneses saw at least one

15  passenger in the Suburban, but could not see in the back of the vehicle due to its

16  tinted windows. Sgt. Cueto could also not see inside the vehicle at all.

17        The fact that the windows of the Suburban were tinted increased the Officers'

18  perception of the danger of the vehicle stop.  There was no way for officers to know

19  who or how many people were inside the vehicle, and whether they were armed and

20  dangerous.

21        Meanwhile, other Officers also heard Sgt. Cueto's commands and endeavored

22  to respond to the location of the Suburban while it was in motion.  These Officers

23  included Defendants Brittany Primo and Eduardo Piche (partners in the same

24  vehicle), Officers Daniel Gayton and non-defendant Zachary Neighbors, Officers

25  Airam Potter and Daniel Martinez (in the same vehicle), and Officers Jeff Rood and

26  Rodrigo Soria (in the same vehicle).  Each of these officers arrived after the "high-

27  risk" stop was already in process, and Sgt. Cueto did not believe that he should tell

28  any of them to leave once they arrived.

1       Per LAPD policy, once sufficient backup Officers, an airship, and a supervisor
2 (here, Sgt. Cueto) had responded to the vicinity of the in-motion Suburban, Officers
3 Gonzalez and Meneses activated their light bar and instructed the driver to pull over.

4       The "high-risk stop" of the Suburban had already begun by the time that
5 Officers Primo, Piche, Rood, Soria, Potter, and Gayton arrived and/or exited their
6 police vehicles.

7       Once the Suburban – subsequently discovered to be driven by Hasmik Jasmine
8 Chinaryan – pulled over to the side of Foothill Boulevard, the driver was given verbal
9 directions from Officer Meneses (along with Sgt. Cueto and Officer Rood) to turn off
10 the vehicle, to throw the keys outside, to step out with her hands up, to walk to the
11 left, to get down on her knees, then to lie down on her stomach with her hands out
12 and her head to the left (i.e., the "prone" position), and to not move, to which she
13 substantially complied.

14       Meanwhile, Officers Gonzalez and Potter gave verbal commands for the
15 passengers in the Suburban – Mariana Manukyan and NEC – to step out of the
16 Suburban and to walk backwards on the sidewalk towards Officers Martinez and
17 Potter.  Officer Potter conducted a "pat down" search for weapons and handcuffed
18 both of them pending investigation.

19       Once Ms. Chinaryan was lying prone, Sgt. Cueto directed Officer Gayton to
20 approach her ("Daniel [Gayton], you guys move up") and thus, directed that Officer
21 Primo approach and handcuff Ms. Chinaryan.  Officer Primo applied the handcuffs,
22 and Officers Gayton, Soria, and Rood provided cover for him while he did so.

23       Ms. Chinaryan was then escorted by Officer Soria towards one of the police
24 vehicles, where she said she was "fine."  Officer Soria informed Ms. Chinaryan that
25 she would be "patted down" for weapons.  Ms. Chinaryan was "patted down" by
26 female Officer Primo and escorted to the sidewalk to stand with Ms. Manukyan and
27 NEC.

28 ///

When asked for the location of her identification (i.e., driver license), Ms. Chinaryan told Officer Soria that it was located in her purse in the car and did not express any objection to the identification being located there. Officer Soria conveyed the location of the identification in the purse to Officer Meneses.

Based on statewide POST (Peace Officer Standards and Training) for all California peace officers regarding "High-Risk Vehicle Pullovers," a part of that training for "high-risk" stops involves the "Deploy[ment of] firearms (i.e., handgun, shotgun, or patrol rifle) at the ready."

During the time when Ms. Chinaryan, Ms. Manukyan, and NEC were being ordered out of the vehicle, the Officers (excluding Sgt. Cueto) had their weapons drawn at the "low ready" position, which means holding the weapon at an angle less than 90 degrees, so that the officer can still view the subject and assist if necessary. The "low ready" position means that the weapon is not "up on target" or "on sights" with any person's body or an object with the intention of shooting a target immediately. Rather, the weapon is kept canted down but "ready" if the circumstances change and become more dangerous. Sgt. Cueto never drew any weapon during the incident.

Use of the "low ready" position involves the officer's "trigger finger" being placed on the "slide" or "frame" of the weapon but off the trigger itself so that the weapon could not be fired at anyone. In this case, no Officer ever had his or her "trigger finger" on the trigger of any weapon used; rather, every Officer's finger was always kept on the slide of the weapon.

The Suburban was "cleared" for the presence of other persons by Officers Meneses, Piche, and Gonzalez (who opened the doors), and non-defendant Officer Neighbors (who opened the back hatch). They briefly looked inside the Suburban for other individuals or weapons with negative results. Officer Meneses removed Ms. Chinaryan's purse from the vehicle, located her driver license and copied information from it by hand.

1         Officers Gonzalez, Meneses, Neighbors, Rood, and Gayton examined the

2 various locations of the VIN (Vehicle Identification Number) on the Suburban.  The

3 VIN was then "run" by Officer Gonzalez using a police Mobile Data Computer

4 ("MDC").

5         According to the MDC, the license plate on the Chevrolet Suburban, 09344S2,

6 was returned to a 2017 Dodge Ram pickup truck registered to Anastasiia Duniaka of

7 Hollywood.

8         According to the MDC, the VIN number of the Suburban was registered to

9 Levon Chinaryan, the husband of Ms. Chinaryan, and the associated license plate

10 should be 09343S2.  The critical difference is the fourth digit, which was a "4" on the

11 physical license plate but should actually be a "3" according to the California

12 Department of Motor Vehicles registration records.

13         After Officer Gonzalez conveyed the discrepancy to Officer Meneses, Officer

14 Meneses explained the DMV error to Sgt. Cueto.

15         The DMV gave or sent Ms. Chinaryan's husband the incorrect license plate for

16 the Suburban. Sgt. Cueto had never seen this happen before in his 22-year career.

17         As a routine part of any traffic stop, all identified individuals are checked for

18 "wants and warrants," which was completed in this case by Officer Soria using the

19 MDC system.

20         After all persons had been identified and checked for wants and warrants, and

21 the license plate/VIN discrepancy had been resolved, Sgt. Cueto directed that all

22 three individuals be un-handcuffed while he, Officer Meneses and Officer Rood

23 explained the circumstances that led to the stop to the three detainees, who were un-

24 handcuffed by Officers Potter, Martinez, and Soria.

25         Officers removed the incorrectly-issued license plate from the Suburban, gave

26 Ms. Chinaryan instructions about replacing the plates at the DMV, and provided an

27 explanatory business card in case the vehicle was stopped again before replacement

28 plates could be obtained.

The total detention time of each Plaintiff – from the time each was ordered out of the vehicle until she was un-handcuffed are as follows:  Ms. Chinaryan was detained for 13 minutes and 5 seconds; Ms. Manukyan was detained for 13 minutes and 30 seconds; and NEC was detained for 14 minutes and 30 seconds.  Ms. Chinaryan was proned-out on the ground for approximately 3 minutes.

The total detention time of under 15 minutes is similar or even shorter than the detention time involved in a typical traffic citation, based on Sgt. Cueto's training and experience.

Plaintiffs have no evidence that any Defendant Officer intended to violate their constitutional rights during the incident.

The Chevrolet Suburban reported stolen from ST Limos was recovered by LAPD Officers at 9631 Glenoaks Blvd. in Foothill Division, on June 17, 2019, the day following the incident with Ms. Chinaryan.  The location where the stolen vehicle was recovered is approximately 1.3 miles from the location where Sgt. Cueto first saw Ms. Chinaryan driving (i.e., the intersection of Sunland and Tuxford).

### D.   Defendants' Counterclaims And Affirmative Defenses Applicable To Claim 2.

**Tenth Affirmative Defense:**  *Entity Immunity re: Punitive Damages*

### E.   Elements To Affirmative Defenses.

**Tenth Affirmative Defense:**  *Entity Immunity re: Punitive Damages*

Defendant City of Los Angeles and all Defendants sued in their official capacities are immune from the imposition of punitive damages.

Based on the parties' meet-and-confer, this affirmative defense is not in dispute as to the sole surviving *Monell* claim.

### F.   Defendants' Evidence In Support Of Each Affirmative Defense.

Defendants believe that the evidence supporting their affirmative defense regarding *Monell* liability needs no further evidence – entity Defendants cannot be subject to punitive damages on a *Monell* claim via *respondeat superior*.

**G.**   **Evidentiary Issues.**

Defendants will separately raise evidentiary issues in their motion(s) *in limine*. Other than those issues, Defendants do not believe that they will have any evidentiary problems with their defenses.  However, Defendants believe Plaintiffs may have evidentiary problems with their claims, as they may try to introduce hearsay, irrelevant and other inadmissible evidence to support their claims.

The Court should be aware that the incident commander in this incident, former defendant Sgt. Fred Cueto, died in December 2020 due to COVID-19.  As such, the Defense will seek to introduce large portions of his deposition pursuant to F.R.C.P. 32(4)(a).

**H.**   **Issues Of Law.**

   **1.**   **Defendants Did Not Violate Plaintiffs' Fourth Amendment Rights Via A Municipal "Policy, Practice Or Custom."**

The Fourth Amendment prohibits unreasonable searches and seizures.  *See* U.S. Const. Amend. IV.  To be successful on Plaintiffs' Fourth Amendment claim, Plaintiffs must show that Defendants intentionally deprived Plaintiffs of their individual constitutional rights.  The law is clear that negligence alone is not sufficient to establish a constitutional violation.  *See Daniels v. Williams,* 474 U.S. 327, 328 (1986).  Contrary to Plaintiffs' contentions, Defendants did not violate Plaintiffs' Fourth Amendment rights, nor were Plaintiffs' subject to a "*de facto*" arrest.  Rather, Plaintiffs were lawfully stopped based on ample reasonable suspicion and detained pending investigation for less than 15 minutes in accordance with constitutional law.

   **2.**   **Plaintiffs Must Prove That An Individual Employee Of Defendants Violated Their Constitutional Rights Before They Can Prevail On Their *Monell* Claim.**

In its ruling on the parties' cross-MSJs, the Court granted qualified immunity to all individual Defendant officers.  *See* Docket #77.  The only remaining

Defendants are governmental entities – the City of Los Angeles and its police agency, the Los Angeles Police Department. *Id*. Regarding the *Monell* claim, the Court ruled in its MSJ order that summary judgment on the issue of "whether the high-risk tactics used during the traffic stop under the circumstances known to the officers violated Plaintiffs' Fourth-Amendment rights and leaves this determination for the jury." *Id*. The Court did, however, make a finding that "the Municipal Defendants' policy was the 'moving force' behind the officers' actions. However, the Court does not rule on whether the policy is constitutional and leaves this question for the jury." *Id*.

The parties disagree on what must be proven by Plaintiffs to succeed on their *Monell* claim. Defendants contend that the jury must find that an individual employee of the entity Defendants committed an *underlying constitutional violation* before they can find that a *Monell* violation has occurred, even though the court has already found that the City's policy, practice, or custom was the "moving force" behind any such theoretical violation.

a.   <u>Legal Standards Governing Municipal Liability Claims.</u>

"Municipalities are considered 'persons' under 42 U.S.C. § 1983 and therefore may be liable for causing a constitutional deprivation." *Lucas v. City of Visalia*, 2013 U.S. Dist. Lexis 65855, *54 (E.D. Cal. May 8, 2013) *citing Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). "A municipality, however, 'cannot be held liable solely because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat superior* theory.'" *Id*. at *54-*55 *citing Monell*, 436 U.S. at 691; *Long*, 442 F.3d at 1185; *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002). "Liability only attaches where the municipality itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Id*. at *55 *citing Monell*, 436 U.S. at 694; *Ulrich*, 308

11

F.3d at 984.

"Municipal liability may be premised on: (1) conduct pursuant to an expressly adopted official policy; (2) a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity; (3) a decision of a decision-making official who was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (4) an official with final policymaking authority either delegating that authority to, or ratifying the decision of, a subordinate." *Id*. at *55 *citing Price v. Sery*, 513 F.3d 962, 966 (9th Cir. Or. 2008); *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004); *Ulrich*, 308 F.3d at 984-85; *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). "A 'policy' is a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id*. at *55-*56 *citing Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008); *Long*, 442 F.3d at 1185. "A 'custom' for purposes of municipal liability is a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *Id*. at *56 *citing St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988); *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 890 (9th Cir. 1990). "'Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.'" *Id*. at *56 *citing Trevino*, 99 F.3d at 918; *McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000); *Thompson v. Los Angeles*, 885 F.2d 1439, 1443-44 (9th Cir.

12

1989).[1]

"After proving one of the above theories of liability, the plaintiff must show that challenged municipal conduct was both the cause in fact and the proximate cause of the constitutional deprivation." *Id*. at *56-*57 *citing Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008); *Trevino*, 99 F.3d at 918. "'[I]t is not enough that a § 1983 plaintiff merely identifies conduct properly attributable to the municipality.'" *Orellana v. Cnty. of Los Angeles*, 2013 U.S. Dist. Lexis 198186, *73 (C.D. Cal. Apr. 29, 2013), *aff'd on separate grounds*, 630 F. App'x 730 (9th Cir. 2016) *citing Moore v. County of Los Angeles*, 2012 U.S. Dist. Lexis 115193, *16 (C.D. Cal. Aug. 15, 2012). "Plaintiff must also adduce evidence that 'deliberate conduct' by the municipality was the 'moving force' behind the alleged injury by showing 'a direct causal link between the municipal action and the deprivation of federal rights.'" *Orellana*, 2013 U.S. Dist. Lexis 198186 at *73-*74 *citing Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).

**b.    "Policy, Custom, Or Practice."**

In their FAC, Plaintiff allege "entity liability" based on:

(a) Failing to adequately train, supervise, and control LAPD officers in uses of force, including the pointing of firearms at people not reasonably suspected to be armed and dangerous, and allowing officers to claim the firearm is at a "low ready" when in fact it is pointed at a human being;
(b) Failing to adequately train, supervise, and control LAPD officers in making traffic stops based on reasonable suspicion by, among other things, allowing them to carry out "high risk stops," including pointing firearms, proning people out, and handcuffing, based on reasonable suspicion of property crimes, and without regard to the four factors set forth by the Ninth Circuit;
(c) Failing to adequately train, supervise, and control their officers in

---

[1] *Thompson v. Los Angeles* was overruled (on other grounds) by *Bull v. City & County of San Francisco*, 595 F.3d 964, 981 (9th Cir. 2010).

proper communication and appropriate responses to members of the public; and

(d) Authorizing "high risk stops" under circumstances that are not high risk.

FAC at p. 10-11.

Based on the parties' Rule 16 meeting, Defendants believe that Plaintiffs are proceeding upon a theory of a "policy, custom, or practice," rather than a "failure to train," theory, as it is undisputed that the Officers were following their training during the stop of Plaintiffs.  Rather, the question for the jury is whether any individual Officer violated the Plaintiffs' Fourth Amendment rights in the manner in which the stop was conducted "under the circumstances known to the Officers." Although the Court has made a finding that the "moving force" element has been satisfied through Plaintiffs' MSJ, Defendants contend that there is no "policy" that directed this particular stop, but rather, it was the individual Officers' (primarily the late Sgt. Cueto's) decisions, *in their discretion*, to employ the tactics used during the incident "under the circumstances known" to them at the time.  Nevertheless, Defendants expect Plaintiffs to argue that this incident was in accordance with a "practice" or "custom" of effectuating high-risk stops on reasonably suspected stolen vehicles.

Defendants will present evidence that this particular stop was based on the particular "circumstances known" to the Defendants' employee Officers, who believed, given the highly-unusual and peculiarly coincidental facts of this case, that Plaintiffs were driving a stolen vehicle that was at large and believed to be in the vicinity where Plaintiffs were driving.  Due in part to the darkness and time of day and the tint of the windows, the Officers were unaware of the identity of the persons inside the vehicle, and based on their training and experienced regarding the apprehension of stolen vehicles, proceed with this particular vehicle stop as a "high risk" stop, in accordance with statewide Peace Officer Standards and Training

14

(POST) and LAPD guidance.  It is undisputed that, in addition to the amazing similarity of Plaintiffs' vehicle to that of the stolen vehicle, the DMV is the cause of the license plate "mis-match" error.

### c.  Causation.

As the Court noted in its MSJ ruling, "Plaintiffs "must show both causation-in-fact and proximate causation." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir.  19 2013).  Although the Court has found that that the City's policy, practice, or custom was the "moving force" behind any theoretical constitutional violation, Plaintiffs "must show that challenged municipal conduct was both the cause in fact and the proximate cause of the constitutional deprivation." *Lucas*, 2013 U.S. Dist. Lexis 65855 at *56-*57 citing *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008); *Trevino*, 99 F.3d at 918.  Here, Plaintiffs lack evidence to show a direct causal link between all of the alleged "policies", "practices" or "customs" and the alleged constitutional harm suffered by Plaintiffs, such that the City of Los Angeles can in fact be said to have caused the harm.

### d.  *Fairley v. Luman* And *Wroth v. City Of Rohnert Park* And The Question Left For The Jury.

As stated, *supra*, the central dispute between the parties as to what the jury must determine, in light of the Court's cross-MSJ ruling, seems to be whether or not the jury must find an underlying constitutional violation before it can reach the issue of *Monell* liability, despite the fact that the Court has already determined that the "moving force" element has been satisfied by the Plaintiffs.  Based on the parties' Rule 16 conference, Defendants expect the Plaintiffs to argue that a municipal entity can be liable for a *Monell* claim, even absent an underlying constitutional violation by an entity employee, largely based on the rationale of *Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002).  Defendants disagree and contend that the jury must *first* find that an entity employee violated Plaintiffs' constitutional rights *before* it can find entity *Monell* liability, *even though* the Court has already ruled that any such

15

theoretical violation was caused by the entity's policy, practice, or custom.

Although Defendants have not found a precisely on-point case involving the exact issues presented in this jury trial, a recent case from the Northern District of California, *Wroth v. City of Rohnert Park*, 2019 U.S. Dist. LEXIS 229936 *; 2019 WL 8333513 (N.D. Cal. 2019), does address Defendants' contentions regarding the requirement for an underlying constitutional violation by an entity employee and also addresses *Fairly v. Luman*, the case upon which Plaintiffs rely for their contentions, discussed *infra*.

The *Wroth* case involved a jury trial in which the jury determined that the individual defendant Officers were "deliberately indifferent" to the decedent plaintiff's constitutional rights but that such "deliberate indifference" was not the "moving force" behind the decedent's death. The jury *then also* determined, in sum, that the "deliberate indifference" was caused by the entity city's failure to train the individual officers and awarded damages. The trial court then reversed its own decisions in instructing the jury as it did.

In its post-verdict F.R.C.P. 49 opinion, the *Wroth* court opined:

As a matter of first principles, a municipality may only be held liable under § 1983 where a deprivation of rights has occurred. 42 U.S.C. 1983 ("Every person who . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . .") ... *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.") ... The Supreme Court articulated this principle in *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986), where it held that *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) does not authorize "the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." *See also Quintanilla v. City of*

16

*Downey*, 84 F.3d 353, 355 (9th Cir. 1996) ("[A]n individual may recover under § 1983 only when his federal rights have been violated."); *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights.").

…

Plaintiffs rightly note that a municipality can be held liable for inadequately training officers who themselves are not liable because they have received qualified immunity. ECF No. 196 at 9 (citing *Palmerin v. City of Riverside*, 794 F.2d 1409, 1415 (9th Cir. 1986)). But in that situation, the reason the officers escape liability is not that there was no constitutional violation, but that the law was not clearly established. *See Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019) ("[A] municipality may be liable if an individual officer is exonerated on the basis of the defense of qualified immunity, because even if an officer is entitled to immunity a constitutional violation might still have occurred.") (citation omitted). Those are not the facts here. Rather, the jury found that the officers did not cause a constitutional injury to Plaintiffs. Similarly, in the case Plaintiffs cite, the district court dismissed *Monell* claims against a municipality because a jury had found that the officers did not violate the plaintiffs' rights. *Palmerin*, 794 F.2d at 1410. The Ninth Circuit affirmed this decision because **"a *Monell* claim . . . is not possible, by its own terms, if the officers acted constitutionally."** *Id.* **at 1415.**

…

Plaintiffs cite two additional Ninth Circuit cases, neither of which controls the question now before the Court. In *Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002), the court affirmed a jury verdict holding the city of Long Beach liable for incarcerating the plaintiff on a warrant for his twin brother even though the jury had found that the individual officers did not violate the plaintiff's rights. … But the *Fairley* court viewed that case as a species of direct municipal liability, where the "collective inaction of the Long Beach Police Department" directly caused the plaintiff's injuries. 281 F.3d at 917. The "constitutional deprivation — the touchstone of § 1983 liability — was a consequence of city policy," not the officers' actions. *Id*. Plaintiffs also cite *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992), which noted that a city "might be held liable for improper training or improper procedure even if [the individual officer] is exonerated, since they put an officer on the street who is so badly trained and instructed he lets his baton be taken away from him and then has to kill an unarmed civilian to save his own

17

life." However, not only is that language dicta, it also conflicts with numerous Ninth Circuit cases holding that **an underlying constitutional violation is necessary for indirect municipal liability.** *See Quintanilla*, 84 F.3d at 355; *Scott v. Henrich*, 39 F.3d at 916.3 [emphasis added]

Upon reflection, the Court concludes that its prior decisions on this question were in error. The error was simple but fundamental: the Court implied that the jury could find Rohnert Park liable for failing to adequately train its officers even if the officers did not violate the Plaintiffs' constitutional rights. But a failure-to-train claim requires an underlying violation by the officers. Accordingly, to hold the city liable on their municipal failure-to-train claim, the Plaintiffs first had to show that the officers violated their constitutional rights. That in turn required the jury to find both that the officers were deliberately indifferent and that they caused Branch Wroth's death. Because the jury here concluded that the officers' deliberate indifference was not "the moving force" behind Wroth's death, Plaintiffs failed to establish that their constitutional rights were violated. Permitting the jury to proceed to the question of municipal liability was thus clear error.

*Id*. at *10-15. (emphasis in bold added)

Defendants contend that, much as in *Wroth*, the jury must *first* determine that an *individual entity employee* committed a Fourth Amendment constitutional violation of the Plaintiffs' rights, regardless of whether Plaintiffs' theory is a policy/practice/custom theory (as is here) or a failure-to-train theory (as in *Wroth*). Defendants acknowledge that, unlike with the *Wroth* jury, this Court has already determined that, should any theoretical constitutional violation by an individual entity employee be found by the jury, the City's policy, custom, or practice is the "moving force" behind that theoretical constitutional violation. Nevertheless, as *Wroth* and *Quintanilla*, *supra*, both note, "an underlying constitutional violation is necessary for indirect municipal liability."

*Fairley v. Luman, supra*, is clearly distinguishable from the instant case. In that case (unusually involving identical twins, one with a warrant but the other twin was arrested), there were allegations of *two separate sets* of constitutional violations

18

1  – the individual officers were accused of excessive force claims, which the jury

2  exonerated them of – yet the municipal entity was also accused of separate

3  allegations of "arrest without probable cause and a *Monell* claim against the City for

4  violation of plaintiff's civil rights by reason of a policy, custom or practice of its

5  Police Department" for deprivation of liberty without due process. *Id*. at 915.  These

6  alleged constitutional deprivations against the city entity in *Fairley* were not suffered

7  as a result of the officers' actions, but as a consequence of city policy.

8       In the instant case, however, while this Court has already found that any

9  policy, practice, or custom is the "moving force" behind any theoretical

10  constitutional violation by an individual entity employee, this Court has *not*

11  determined whether any constitutional violation has occurred *at all*, and has left that

12  question to the jury.  Defendants contend that this a mixed question of law and fact

13  that may require additional judicial determination before the case can proceed to a

14  jury verdict.  The jury cannot possibly determine the legal issue of whether the

15  Defendant city's "policy, practice, or custom" violated the United States

16  Constitution.  The jury could, however, determine if any of the individual entity

17  employees deprived the Plaintiffs' of their particular constitutional rights, and *only if*

18  *such a determination was reach*ed, could the Plaintiffs prevail on their *Monell* claim.

19            **e.      Additional Jury Instructions Should Be Given**

20                      **Regarding The Underlying Constitutional Violation By**

21                      **A Non-Defendant Individual Employee.**

22       In light of the above, Defendants believe that the Court will also need to

23  instruct the jury on an underlying constitutional violation by an individual,

24  specifically 9th Circuit Model Jury Instructions 9.20 and 9.21:

25       *9th Circuit Model Instruction 9.20 – Particular Rights – Fourth Amendment –*

26  *Unreasonable Seizure of Person – Generally*

27            1.      [name[s] of applicable defendant employee] seized the plaintiff's

28                    person;

2.      in seizing the plaintiff's person, [name[s] of same person[s]] acted intentionally; and

3.      the seizure was unreasonable.

*Id.*

*9th Circuit Model Instruction 9.20 – Particular Rights – Fourth Amendment – Unreasonable Seizure of Person – Exception to Warrant Requirement – Terry Stop*

1.      the officer[s] had a reasonable suspicion that the person seized was engaged in [criminal activity]; and

2.      the length and scope of the seizure was reasonable.

*Id.*

## I.      <u>Bifurcation Of Issues.</u>

As discussed, *supra*, Defendants contend that the jury must *first* find that an individual employee of the Defendant entity violated the Plaintiffs' constitutional rights *before* it can find the entity Defendants liable. Even though the Court has already determined that, if such a theoretical constitutional violation has occurred, then the City's policy, practice, or custom is the "moving force" behind such a theoretical violation, the jury must still first decide if any such violation has occurred at all. Thus, in this highly unusual circumstance, the trial should be bifurcated to (1) find whether or not any *individual* violated the Plaintiffs constitutional rights, and then*, if and only if such a finding is made*, (2) hear and determine what damages, if any, to award.

Compensatory damages are not so closely intertwined with liability that evidence of damages necessarily needs to be heard during the liability phase. Evidence regarding the extent and reasonableness of compensatory damages will require testimony from several witnesses, who are not relevant to liability. In fact, Defendants will be prejudiced if evidence of any damages is allowed at the same time as liability as the damages witnesses will not be offering any evidence related to liability. Separating liability and damages also will alleviate the potential for the

jury to find liability simply because Plaintiffs claim significant damages.

**J.      Jury Trial.**

Defendants contend that the issues in this case are appropriate for a jury trial, and that a jury trial has been properly requested.

**K.      Attorneys' Fees.**

The prevailing party on the federal claims may be entitled to recover attorney's fees under 42 U.S.C. § 1988.

**L.      Abandonment Of Issues.**

Since the instant jury trial will consist of only one claim – unreasonable force under 42 U.S.C. § 1983 – most of the affirmative defenses enumerated in Defendants' Answer will not apply to the single claim to be tried by jury. Defendants believe that the only applicable affirmative defense that applies to the single remaining *Monell* claim is that regarding entity immunity from punitive damages, *supra*.  Defendants have not "abandoned" any of their defenses contained asserted in their Answer to the First Amended Complaint, but believe none of them apply to the remaining claim.  However, Defendants reserve their right to assert further defenses or abandon any defenses as Plaintiff's contentions become known.

**M.      Witness List.**

Defendants' Witness List has been filed under separate cover.

**N.      Exhibit List.**

The parties' Joint Exhibit List will be filed under separate cover.

///
///
///
///
///
///

## II.    <u>CONCLUSION.</u>

Defendants reserve the right to supplement these contentions as the Court's rulings, Plaintiffs' contentions, and/or other evidence, becomes known to Defendants.

Dated:  July 19, 2021          Respectfully submitted,

**MICHAEL N. FEUER**, City Attorney
**KATHLEEN A. KENEALY**, Chief Deputy City Atty.
**SCOTT MARCUS**, Senior Assistant City Attorney
**CORY M. BRENTE**, Senior Assistant City Attorney

By: _/s/ Ty A. Ford_
     **TY A. FORD**, Deputy City Attorney
*Attorneys for Defendants*
**CITY OF LOS ANGELES and LOS ANGELES POLICE DEPARTMENT**